**\*FOR PUBLICATION\***

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

———————————————————————

|   |   |
|---|---|
| OTICON, INC., | : |
|  | : |
| Plaintiff, | : |
|  | : |
| vs. | : |
|  | : |
| SEBOTEK HEARING SYSTEMS, LLC., | : |
| GENNUM CORPORATION, and SOUND | : |
| DESIGN TECHNOLOGIES, LTD., | : |
|  | : |
| Defendants. | : |
|  | : |

Civil Action No. 08-5489 (FLW)

**OPINION**

———————————————————————

**WOLFSON, United States District Judge:**

Presently before the Court is a motion to dismiss by Defendant Sound Design Technologies, Ltd. ("SDT") pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction. Plaintiff Oticon Inc. ("Plaintiff") brings this action against SDT and other defendants for patent infringement. SDT argues that the Court lacks jurisdiction over SDT because it does not have the minimum contacts with this forum required by Int'l Shoe Co. v. Washington, 326 U.S. 310 (1945), to assert personal jurisdiction. For the reasons that follow, the Court grants SDT's motion, and Plaintiff's claims against SDT are hereby dismissed.

## I.    Background

Plaintiff, a California corporation with its principal place of business in New Jersey, is the owner by assignment of U.S. Patent # 5,365,233 ("Patent"). Am. Compl., ¶ 1, 16.[1] The patent

———————————————————————

[1]    The Court's recount of the plaintiff's allegations relies upon the Amended Complaint, which is the complaint that was in effect at the time SDT's motion to dismiss was filed. Moreover,

embodies a method for creating an "analog-digital processing unit including an amplifier with amplification that is adjustable in stages." Id., Exh. A (Abstract). The patented method is "directed toward the processing of analog voice signals, as for digital operating hearing aids ...." Id., Exh. A at 1:19-20.

In light of the arduous path this litigation has forged, I first explain the procedural history before recounting the relevant jurisdictional facts. Plaintiff initially filed this patent infringement suit on November 7, 2008, against Defendant Sebotek Hearing Systems, LLC. ("Sebotek"), an Oklahoma corporation that manufactures Voice-Q hearing aids, Am. Compl. at ¶ 2, 20, and Vivatone Hearing Systems, LLC ("Vivatone"). The following spring, on March 3, 2009, the parties agreed to, and then-presiding Magistrate Judge Tonianne J. Bongiovanni entered, a Discovery Confidentiality Order ("Confidentiality Order") that governs the disclosure of confidential information by "[a]ny party to this litigation ...." Confidentiality Order dated March 3, 2009 at ¶ 1.

Once the Confidentiality Order was entered, the parties engaged in discovery. Thereafter, Plaintiff sought an Order from Magistrate Judge Lois H. Goodman[2] directing issuance of Letters Rogatory and/or Letters of Request in aid of discovery abroad pursuant to 28 U.S.C. § 1781(b)(2), permitting Plaintiff to obtain discovery from Gennum Corporation ("Gennum") and SDT— two Canadian companies that manufacture component parts of hearing aids. That request was granted on May 28, 2009, and Letters Rogatory issued on that same date.

After reviewing discovery provided by Vivatone, which discovery suggested that Vivatone's

---

even though Plaintiff filed a Second Amended Complaint during the pendency of the instant motion to dismiss, that amendment does not contain facts that affect this Court's personal jurisdiction analysis.

[2]     The case was reassigned to Magistrate Judge Goodman on April 1, 2009.

products did not infringe on Plaintiff's patent, Plaintiff moved to voluntarily dismiss Vivatone from the suit on July 16, 2009. <u>See</u> Chasin Afft. dated July 16, 2009 at ¶ 3. This Court granted that motion, leaving Defendant Sebotek as the sole remaining defendant at that time. The parties then filed their respective claim construction briefs with the Court, over the course of several months.

Thereafter, Plaintiff moved for leave to file an amended complaint, with the consent of Sebotek, in order to add Gennum and SDT as defendants. That motion was granted on February 23, 2010. Plaintiff filed its Amended Complaint on March 3, 2010. In the Amended Complaint, Plaintiff describes Gennum as a Canadian corporation that sold digital signal processors ("DSP") and other electronic components used in manufacturing hearing aids. <u>Id.</u> at ¶ 3, 11. It describes SDT as another Canadian corporation with its principal place of business in Ontario, Canada, that also sells DSPs along with other hearing-aid component parts. <u>Id.</u> at ¶ 4.

Generally, Plaintiff's Amended Complaint alleges that all three defendants infringed on Plaintiff's patent by making and selling hearing aids and DSPs that utilize "methods covered by one or more claims of the '233 patent without Plaintiff Oticon's authorization ...." <u>Id.</u> at ¶ 19. According to the complaint, the infringing products include the Voice-Q hearing aids sold by Sebotek, and the Paragon and Voyager DSPs sold by both Gennum and SDT. The Amended Complaint alleges that all defendants engaged in both direct infringement and inducement to infringe, though it contains no allegations regarding the dates of infringement or inducement. <u>Id.</u> at ¶ 22-23. There are no non-patent claims asserted by the Amended Complaint.

A few months after the Amended Complaint was filed, SDT moved to dismiss for lack of jurisdiction on May 12, 2010. Plaintiff, in response, requested permission from Magistrate Judge Lois H. Goodman to engage in jurisdictional discovery, and to stay SDT's motion until that

discovery was completed. Magistrate Judge Goodman granted Plaintiff's request, and entered an Amended Scheduling Order, on June 18, 2010, that granted SDT the right to refile its motion to dismiss at the conclusion of jurisdictional discovery.

Through the jurisdictional discovery, it became apparent that SDT did not exist before 2007. Rather, it was formed, on September 7, 2007, through the purchase of Gennum's digital signal processor-related assets. Pl. Opp. Br., Ex. 33. Prior to that date, Gennum manufactured its own DSPs that were used in hearing aids. Id. Following SDT's creation, however, SDT now manufactures the DSPs formerly manufactured by Gennum. Id.

Once the jurisdictional discovery was completed, SDT ultimately refiled its motion to dismiss in early 2011. While the refiled motion was pending before this Court, both Plaintiff and SDT filed motions to seal their motion to dismiss papers, and exhibits relating to that motion, to the extent they contained information covered by the Confidentiality Order. These motions were granted. Thereafter, since the original briefs were sealed, the parties filed redacted versions of their papers and exhibits, with the last document being filed August 1, 2011.

Plaintiff also sought leave to file a Second Amended Complaint while the motion to dismiss was pending, which leave was granted on April 21, 2011. The Second Amended Complaint names specific Sebotek models that allegedly violate Plaintiff's patent, such as the Voice-Q 410 and Voice-Q 510, and adds that, Gennum's and SDT's Foundation products, as well as their Paragon and Voyager products, infringe the patent. See Second Am. Compl., ¶ 20.

Returning now to Plaintiff's jurisdictional allegations and evidence, Plaintiff asserts that the Court has personal jurisdiction over SDT because SDT has:

> solicited business in the State of New Jersey, regularly introduced

articles in to the stream of commerce that have been sold in the State of New Jersey, and have attempted to derive financial benefit from residents of the State of New Jersey, including benefits directly related to the instant cause of action set forth herein.

Am. Compl., ¶ 10. More specifically, Plaintiff asserts that SDT engaged in two types of contacts.[3] First, Plaintiff asserts a set of contacts pertaining to actions taken directly by SDT. This includes a strategic alliance agreement between SDT and Sebotek; an email from SDT describing sales to one of its hearing aid manufacturer-customers, Zounds, in which SDT and Zounds employees discuss the prospect of conducting business in New Jersey; and sales by Starkey, another of SDT's customers, of over 4,000 hearing aids in New Jersey.

Second, Plaintiff asserts a set of contacts pertaining to actions take by Gennum, which Plaintiff argues gives rise to personal jurisdiction over SDT through the theory of successor liability. These contacts include Gennum's intentional targeting of sales to a New Jersey manufacturer; trips, emails, and sales to New Jersey residents; millions of dollars of sales in New Jersey; taxes paid in New Jersey; and Gennum's maintenance of a lockbox in New Jersey. SDT's motion to dismiss is now ripe for decision.

## II.    Standard of Review

In patent infringement cases, the Federal Circuit applies its own law regarding the issue of personal jurisdiction "because the jurisdictional issue is intimately involved with the substance of the patent laws." Autogenomics, Inc. v. Oxford Gene Tech. Ltd., 566 F.3d 1012, 1016 (Fed. Cir. 2009). For all nonpatent issues, regional circuit law applies. Fujifilm Corp. v. Benum, 605 F.3d 1366, 1370 (Fed. Cir. 2010). Accordingly, this Court will look first to Federal Circuit law, and

---

[3]     The Court will discuss these contacts in more detail later in the Opinion. A short summary is given here for background purposes.

where there is no relevant Federal Circuit law, the Court will turn to Third Circuit law and the law of the regional circuits for guidance.

"Personal jurisdiction over an out-of-state defendant is appropriate if the relevant state's long-arm statute permits the assertion of jurisdiction without violating federal due process." Nuance Communications, Inc. v. Abbyy Software House, 626 F.3d 1222, 1230 (Fed. Cir. 2010). In this instance, the New Jersey long-arm statute establishes New Jersey's jurisdictional reach conterminous with that allowed under the U.S. Constitution, subject only to due process of law. Id. at 96; Wilson v. Paradise Village Beach Resort and Spa, 395 N.J. Super. 520, 527 (App. Div. 2007) (citing Charles Gendler & Co., Inc. v. Telecom Equip. Corp., 102 N.J. 460, 469 (1986)). Thus, the central inquiry is whether the defendant has "certain minimum contacts with . . . [New Jersey] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." See Int'l Shoe, 326 U.S. at 316 (internal quotation omitted).

Once a defendant mounts a personal jurisdiction challenge, the plaintiff bears the burden of establishing jurisdiction. Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com. De Equip. Medico, 563 F.3d 1285, 1294 (Fed. Cir. 2009). In ruling on such a challenge, the court is not required to hold an evidentiary hearing. Touchcom, Inc. v. Bereskin & Parr, 574 F.3d 1403, 1410 (Fed. Cir. 2009). Where, as here, no such hearing is conducted, the plaintiff must establish a prima facie case of personal jurisdiction. To establish a prima facie case, the plaintiff must show that the nonresident defendant has minimum contacts with the forum state, as will potentially allow exercise of personal jurisdiction over the defendant. See Inamed Corp. v. Kuzmak, 249 F.3d 1356, 1360 (Fed. Cir. 2001). After the plaintiff establishes a prima facie case, "the burden of proof shifts to the defendant, which must 'present a compelling case that the presence of some other considerations would render

jurisdiction unreasonable." <u>Breckenridge Pharmaceutical, Inc. v. Metabolite Laboratories, Inc.</u>, 444 F.3d 1356, 1362 (Fed. Cir. 2006).

Where no jurisdictional discovery has been taken, the court must accept the plaintiff's complaint's allegations as true and resolve all factual disputes in the plaintiff's favor in ruling on the motion to dismiss. <u>Silent Drive, Inc. v. Strong Indus., Inc.</u>, 326 F.3d 1194, 1201 (Fed. Cir. 2003). However, once the plaintiff has been granted discovery, the plaintiff "cannot rely on the allegations of its complaint." <u>The Russian Am. Spirits Co. v. Heublein, Inc.</u>, 936 F.Supp. 177, 192 (D. Del. 1996) (citing <u>Stranahan Gear Co. v. NL Indus. Inc.</u>, 800 F.2d 53, 58 (3d Cir. 1986)).[4]  Rather, Plaintiff "must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence." <u>Id.</u> (quoting <u>Time Share Vacation Club v. Atlantic Resorts, Ltd.</u>, 735 F.2d 61, 66 n. 9 (3d Cir. 1984)).  In essence, plaintiff must point to evidence of specific facts in the record in support of its contention that jurisdiction exists. <u>Id.</u>  With such a supplemented record

---

[4]     The Federal Circuit has applied regional circuit law to determine how to treat facts adduced through jurisdictional discovery in the context of a motion to dismiss for lack of personal jurisdiction.  In <u>Pieczenik v. Dyax Corp.</u>, 265 F.3d 1329 (Fed. Cir. 2001), the Federal Circuit cited Second Circuit precedent for the proposition that "the parties conducted discovery related to the jurisdictional issues . . . [u]nder those circumstances, the plaintiffs bore the burden of proving by a preponderance of the *evidence* the facts necessary to establish personal jurisdiction over the defendant." <u>Id.</u> at 1334 (emphasis added).  Other regional circuits are in accord with the principle that, once jurisdictional discovery has been completed, a <u>prima facie</u> showing of jurisdiction cannot rely solely on allegations alone.  <u>See</u> <u>Time Share</u>, <u>Time Share Vacation Club v. Atlantic Resorts, Ltd.</u>, 735 F.2d 61, 66 n. 9 (3d Cir. 1984) ("A Rule 12(b)(2) motion . . . is inherently a matter which requires resolution of factual issues outside the pleadings, i.e. whether in personam jurisdiction actually lies.  Once the defense has been raised, then the plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavit or other competent evidence."); <u>Boit v. Gar-Tec Prods.</u>, Inc. 967 F.2d 671, 675 (1st Cir. 1992) ("The <u>prima</u> <u>facie</u> showing of personal jurisdiction must be based on evidence of specific facts set forth in the record. . . . The plaintiff must go beyond the pleadings and make affirmative proof."); <u>Serras v. First Tenn. Bank Nat'l Ass'n</u>, 875 F.2d 1212 , 1214 (6th Cir. 1989) ("If the court rules on written submissions alone, the plaintiff may not rest on his pleadings to answer the movant's affidavits, but must set forth, by affidavits or otherwise, specific facts showing that the court has jurisdiction.") (alterations omitted).

before it, a district court is then empowered to "determine whether it has personal jurisdiction" once "the record is complete ...." Trintec Industries, Inc. v. Pedre Promotional Products, Inc., 395 F.3d 1275, 1283 (Fed. Cir. 2005).

## III.    Discussion

Plaintiff raises several grounds for personal jurisdiction: (1) successor liability; (2) stream of commerce jurisdiction; and (3) jurisdiction under the Calder-effect theory enunciated by the Supreme Court in Calder v. Jones, 465 U.S. 783.  The Court separately addresses each basis.[5]

### A.    Successor Liability

Plaintiff claims that the Court has personal jurisdiction over SDT because the Court has jurisdiction over Gennum.[6]  Because SDT is allegedly a successor of Gennum, Plaintiff reasons that SDT is liable for the claims against Gennum.  Thus, if the Court has jurisdiction over those claims, Plaintiff argues, the Court likewise has jurisdiction over SDT.

The general rule of corporate-successor liability is that when a company sells its assets to

---

[5]     Plaintiff's Complaint contains other alleged grounds for personal jurisdiction, which SDT disputes in its moving brief.  However, Plaintiff does not address those grounds in its opposition brief.  As such, the Court finds that Plaintiff has abandoned those alternative arguments.

In addition, before turning to the personal jurisdiction analysis, the Court is constrained to note its displeasure with Plaintiff's briefing.  Contrary to court rules, Plaintiff utilized end notes, as opposed to footnotes, in its opposition brief.  Not only did Plaintiff's use of end notes have the effect of extending the page limitation for its brief, it complicated the Court's review of Plaintiff's record citations.  Moreover, several of Plaintiff's end notes referred back to exhibits contained in prior end note citations.  This convoluted manner of presentation added significant time to the Court's review of Plaintiff's arguments and evidence.

[6]     As summarized above, Plaintiff makes numerous factual assertions to support its claim that the Court has jurisdiction over Gennum.  The Court makes no findings as to the validity of these assertions, and assumes as true, for the purpose of this Opinion, that the Court has personal jurisdiction over Gennum, which has not objected to same.

another company, the purchaser is not liable for the debts and liabilities of the seller simply because it has succeeded to the ownership of the assets of the seller.  Lefever v. K.P. Hovnanian Enters., Inc., 160 N.J. 307, 310 (1999); Luxliner P.L. Export, Co. v. RDI/Luxliner, Inc., 13 F.3d 69, 73 (3d Cir. 1993).  Successor liability may be appropriate if (1) the successor expressly or impliedly assumes the predecessor's liabilities; (2) there is actual or de facto consolidation or merger of the seller and the purchaser; (3) the purchaser is a mere continuation of the seller; or (4) the transaction is entered into fraudulently to escape liability.  Lefever, 160 N.J. at 310; Flagship Interval Owner's Assoc., Inc. v. Phila. Furniture Mfg. Co., No. 09-1173, 2010 WL 1135736, at *6 (D.N.J. Mar. 22, 2010).

Here, Plaintiff argues that SDT expressly assumed Gennum's liabilities in the asset sale.  To support its assertion, Plaintiff points to the Asset Purchase Agreement ("APA") that governed SDT's purchase of Gennum's assets.  See Pl. Opp. Br., Ex. 33 ("APA").  Through the APA, SDT agreed to "purchase certain assets of [Gennum's] Hearing Instruments Business and the Manufacturing Business . . . , and to assume only the Assumed Liabilities on and subject to the terms and conditions contained in [the APA]."  APA at 1.  The APA defines Assumed Liabilities as being, among other things, "[l]iabilities under (i) the Contracts and (ii) the Licenses assumed by the Purchaser, except, in each case, for any matter, circumstance or default existing at, prior to or as a consequence of Closing and that is not accrued for on the Closing Statement."  Id. at 2.  In other words, SDT does not assume any of Gennum's pre-closing liabilities unless that liability is explicitly noted on the Closing Statement.[7]  Because this language indicates that SDT may assume some existing

_____

[7]        The APA further states, "Assumed Liabilities.  At the Closing Time, on the subject of the terms and conditions of this Agreement, the Purchaser shall assume and agree to pay when due and perform and discharge in accordance with their terms, only the Assumed Liabilities.  The Retained Liabilities shall remain the sole responsibility of, and shall be retained, paid and performed solely by, the Vendor."  Id. at p. 19.  In addition, Plaintiff points to similar language in a General

contractual and license obligations arising out of Gennum's prior dealings with Sebotek, Plaintiff argues that whatever infringement Gennum may have committed by selling infringing products to Sebotek are now liabilities that SDT assumed under the APA.

Plaintiff's interpretation of the assumed liability language is unavailing. First, the language provides that SDT is not liable "for any matter, circumstance or default existing at, prior to or as a consequence of Closing and that is not accrued for on the Closing Statement." Assuming for the sake of argument that Gennum committed acts of infringement, Gennum's acts would have been completed the moment each infringing sale was consummated. Hence, under the APA, SDT would assume that liability only if it was explicitly accrued for on the Closing Statement. Plaintiff has not suggested that the Closing Statement reflected any such accrual. Accordingly, the assumed liability language of the APA provides no support for imposing successor liability here.

Second, while the assumed liability language expressly states that SDT assumes all contractual and licensing obligations from Gennum, that language does not encompass any alleged infringements. The APA defines Contracts as "all . . . written customer and supplies contracts, distribution agreements and strategic marketing agreements, [and] purchase orders ...." Id. at 4. And, indeed, the APA expressly incorporates both a Letter of Agreement between Gennum and Sebotek and a "[n]on-exclusive, royalty free perpetual license to make, sell and market [Sebotek's]

_____

Conveyance and Assumption of Liabilities Agreement between Gennum and SDT, in which SDT "assumes and agrees to pay, be liable for, perform, observe, discharge, and fully satisfy, when due, the Assumed Liabilities." The Court notes that it was unable to locate certain of the quoted language in Plaintiff's exhibits via Plaintiff's convoluted end-note citation system. Nonetheless, assuming for the sake of argument that Plaintiff's quotations of the relevant language are correct, Plaintiff's successor liability argument fails for the reasons explained herein.

devices in Canada and Japan pursuant to [that letter agreement]."[8]

Plaintiff appears to argue that, since the APA grants SDT the right to make Sebotek products under Gennum's letter agreement with Sebotek, SDT assumed liability for Gennum's allegedly infringing conduct completed via that agreement. That Sebotek purchased allegedly infringing products from Gennum under a sales or marketing agreement, however, does not transform the alleged acts of infringement into a contractual or licensing obligation. Rather, it is the design, implementation, manufacturing, marketing, and sales of allegedly infringing products that gives rise to any infringement claim—not the contract or licensing agreement itself.

Plaintiff argues in the alternative that the "product line" exception to the general rule against successor liability applies in this case, citing to Ramirez v. Amsted Indus., Inc., 86 N.J. 332, 358 (1981). However, the "product line" exception is used in products liability cases, not patent infringement cases. Id.; Lefever, 160 N.J. at 310; LaFountain v. Webb Indus. Corp., 951 F.2d 544, 547 (3d Cir. 1991). Moreover, the rationale behind this exception is that "the virtual destruction of the plaintiff's remedies against the original manufacturer [was] caused by the successor's acquisition." LaFountain, 951 F.2d at 547. In that connection, the exception does not apply "where the claimant had a potential remedy against the original manufacturer but failed to exercise all available means to assert his or her claim ...." Id. "[A]s a logical matter, the loss of a remedy against the original manufacturer must be a prerequisite to the invocation of the product line exception." Id. (quoting Conway v. White Trucks, Div. Of White Motor Corp., 855 F.2d 90, 95 (3d Cir. 1989)).

---

[8]     According to Plaintiff, this language is found in Schedule 6 of the APA, which lists "all Material Contracts . . . in full force and effect" at the time of closing. Under (12) of the representations and warranties, Gennum represented that these contracts were not in default. See APA at 27.

Plaintiff's contention that the product line exception can be applied to patent infringement cases is a dubious assumption given that an infringement case does not implicate the strict liability concerns and the interests of aggrieved plaintiffs that are present in a products liability case.  See Ramirez, 86 N.J. at 358 ("The social policies underlying strict products liability in New Jersey are best served by extending strict liability to a successor corporation that acquires the business assets and continues to manufacture essentially the same line of products as its predecessor, particularly where the successor corporation benefits from trading its product line on the name of the predecessor and takes advantage from its accumulated good will, business reputation and established customers.") Moreover, even assuming that the exception applies to patent infringement cases, Plaintiff cannot satisfy the strictures of the doctrine.  In this case, there is no loss of remedy against the original manufacturer; in fact, Plaintiff asserts those damage claims against the original manufacturer in this very suit.  Therefore, the Court finds that the product line exception does not apply to Plaintiff's claims against SDT, and Plaintiff's assertion of jurisdiction based on successor liability is rejected.

## B.  Specific Jurisdiction - Stream of Commerce

The inquiry as to whether specific jurisdiction exists has three parts.  First, the defendant must have purposefully directed its activities at the forum state.  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985) (quotation marks omitted).  Second, the litigation must "arise out of or relate to" at least one of those activities.  Helicopteros, 466 U.S. at 414; Radio Sys. Corp. v. Accession, Inc., 638 F.3d 785, 789 (Fed. Cir. 2011).  Finally, if the prior two requirements are met, the court must consider whether the exercise of jurisdiction would offend "[p]rinciples of fair play

and substantial justice." Radio, 638 F.3d at 785.[9]

At the threshold level, the defendant must have "purposefully avail[ed] itself of the privilege of conducting activities within the forum." Hanson v. Denckla, 357 U.S. 235, 253 (1958). Physical entrance is not required. See Burger King, 471 U.S. at 476. But what is necessary is a deliberate targeting of the forum. Nuance Comm'ns, Inc. v. Abby Software House, 626 F.3d 1222, 1231 (Fed. Cir. 2010). Thus, the "unilateral activity of those who claim some relationship with a nonresident defendant" is insufficient. See Hanson, 357 U.S. at 253. Further, contacts with a state's citizens that take place outside the state are not purposeful contacts with the state itself. See Gehling v. St. George's Sch. of Med., Ltd., 773 F.2d 539, 542-43 (3d Cir. 1985). Moreover, the jurisdictional nexus must also be the result of intentional conduct by the defendant and not merely "random, fortuitous, or attenuated contacts." Red Wing Shoes Co. Inc. v. Hockerson-Halberstadt, Inc., 148 F.3d 1355, 1359 (Fed. Cir. 1998) (citation omitted).

In addition to direct and intentional contact with the forum, the Supreme Court has also recognized a "stream of commerce" theory in Asahi to satisfy the purposeful availment requirement for specific jurisdiction. See Asahi Metal Indus. Co. Ltd. v. Super. Ct. of Cal., 480 U.S. 102 (1987). Under the stream-of-commerce theory, specific jurisdiction may be asserted against "a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum state." Viam Corp. v. Iowa Export-Import Trading Co., 84 F.3d 424, 428 (Fed. Cir. 1996) (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297-98 (1980)).

_____

[9]    Although Int'l Shoe held that courts may consider the "notions of fair play and substantial justice" prong of the analysis, 326 U.S. at 316, under Federal Circuit jurisprudence, this prong is mandatory.

While the Supreme Court justices in <u>Asahi</u> were unanimous in their recognition of the stream-of-commerce theory, the justices were divided on its application. Justice Brennan, writing for a four-justice plurality, opined that if a defendant not only foresaw, but expected that its goods can be sold as part of a final product to the consumers of some forum, then personal jurisdiction over that defendant would be proper in that forum. <u>Asahi</u>, 480 U.S. at 117 (Brennan, J., concurring). However, Justice O'Connor, writing also for a four-justice plurality, adopted a more stringent test. In her formulation, mere expectation that a defendant's goods may be sold as part of the final product in a particular forum is insufficient; the plaintiff must also establish some conduct by the defendant that indicates an intent or purpose to serve the market of that forum. <u>Asahi</u>, 480 U.S. at 112.

Because of the even split in the Supreme Court, most circuit courts, including the Federal Circuit, did not formally adopt one test over the other. <u>Nuance</u>, 626 F.3d at 1234. Instead, courts have "avoided choosing one position over the other and have instead decided cases based on facts in the record." <u>Pennzoil Products. Co. v. Colelli & Assocs., Inc.</u>, 149 F.3d 197, 205 (3d. Cir. 1998). Courts have applied the facts of a case to <u>both</u> tests to determine whether jurisdiction is proper. <u>See</u>, <u>e.g.</u>, <u>Beverly Hills Fan Co. v. Royal Sovereign Corp.</u>, 21 F.3d 1558, 1566 (Fed. Cir. 1994). If the facts of the case satisfy both standards, then jurisdiction is established. <u>Id.</u> Furthermore, many courts have held that when a plaintiff establishes a defendant's intent to serve the nationwide market, the plaintiff also establishes intent to serve the markets within each of the states, unless defendant shows a manifest intent to exclude itself from a particular state or states. <u>Power Integrations, Inc. v. BCD Semiconductor Corp.</u>, 547 F.Supp.2d 365, 373 (D. Del. 2008); <u>Tobin v. Astra Pharm. Prods., Inc.</u>, 993 F.2d 528, 544 (6th Cir. 1993); <u>Barone v. Rich Bros. Interstate Display Fireworks Co.</u>, 25 F.3d 610, 614-15 (8th Cir. 1994); <u>OneBeacon Ins. Group v. Tylo AB</u>, 731 F.Supp.2d 250, 260 (D.

Conn. 2010); McGlone v. Thermotex, Inc., 740 F.Supp.2d 381, 384 (E.D.N.Y. 2010). These cases stand for the proposition that a company cannot avail itself of the vast markets of the United States yet avoid liability and litigation by simply asserting that no court has jurisdiction over it because it did not intentionally target any of the individual states. Tobin, 993 F.2d at 544.

The Supreme Court very recently refined the stream of commerce theory in J. McIntyre Machinery, Ltd. v. Nicastro, 131 S.Ct. 2780 (2011).[10] Justice Kennedy announced the judgment of the Court and wrote an opinion for a four-justice plurality, joined by the Chief Justice, Justice Scalia and Justice Thomas. Justice Breyer wrote an opinion concurring in the judgment, joined by Justice Alito. Three justices dissented.

McIntyre was a scrap-metal machinery manufacturer based in England. Id. at 2786. Plaintiff Nicastro was an employee of a scrap metal company based in New Jersey who had purchased a machine made by McIntyre. Id. Nicastro was seriously injured by the machine, and he sued McIntyre for products liability in New Jersey. Id. McIntyre argued that New Jersey courts did not have jurisdiction over it because it had never directed any of its activities to New Jersey. Id. The New Jersey Supreme Court rejected that argument, holding that, under Asahi, it had jurisdiction because McIntyre had (1) intended to serve the United States market by using a national distributor to specifically target the United States, (2) attended trade shows throughout the country (although none in New Jersey), (3) desired and expected its machines to be sold in New Jersey, and (4) took no steps to prevent distribution of its products in New Jersey. Id. Furthermore, the New Jersey Supreme Court also found it significant that the injury occurred in New Jersey. Id.

---

[10]     Because this decision was rendered during the pendency of the instant motion, the Court directed the parties to file supplemental briefing addressing Nicastro.

The plurality opinion of the United States Supreme Court in <u>Nicastro</u> disagreed.[11]  The plurality expressly rejected the test articulated by Justice Brennan in <u>Asahi</u>, under which a defendant who foresaw and expected that its goods can be sold as part of a final product to the consumers of some forum, could be hailed into that forum.  <u>Id.</u> at 2789 ("Justice Brennan's concurrence, advocating a rule based on general notions of fairness and foreseeability, is inconsistent with the premises of lawful judicial power.").  Instead, the plurality adopted an approach consistent with Justice O'Connor's opinion in <u>Asahi</u>.  <u>Id.</u> at 2790.  The plurality explained that "[a]s a general rule, the sovereign's exercise of power requires some act by which the defendant 'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." <u>Id.</u> at 2787.  "[J]urisdiction is in the first instance a question of authority rather than fairness." <u>Id.</u> at 2789.  While the exercise of jurisdiction should not offend "traditional notions of fair play and substantial justice . . . [f]reeform notions of fundamental fairness divorced from traditional practice cannot transform a judgment rendered in the absence of authority into law." <u>Id.</u> at 2787 (internal citation and quotation omitted).

In the plurality's view,

> personal jurisdiction requires a forum-by-forum, or sovereign-by-sovereign, analysis.  The question is whether a defendant has followed a course of conduct directed at the society or economy existing <u>within</u> the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment

---

[11]     Plaintiff argues that the plurality opinion is inapplicable to this case because the opinion stated that "[a]s a general rule, the sovereign's exercise of power requires some act [of purposeful availment,] though in some cases, <u>as with an intentional tort</u>, the defendant might fall within the State's authority by reason of his attempt to obstruct its laws." <u>Id.</u> at 2787 (emphasis added).  This Court agrees that intentional torts may be analyzed differently, but Plaintiff has already raised that issue with its assertion of personal jurisdiction under <u>Calder</u>, which addresses specifically the issue of personal jurisdiction for intentional torts.  I will analyze that argument separately below.

concerning that conduct.

Id. at 2789 (emphasis added). "Because the United States is a distinct sovereign," the plurality reasoned, "a defendant may in principle be subject to the jurisdiction of the courts of the United States but not of any particular State." Id. In essence, the plurality concluded, the defendant's conduct must manifest "an intention to submit to the laws of the forum State." Id. at 2787.

Justice Breyer, in his concurrence, would not adopt as strict a rule as that enunciated by the plurality, but he too voiced his disagreement with the notion that mere foreseeability is the cornerstone of the stream-of-commerce jurisprudence. Id. at 2791-92 (Breyer, J., concurring). In Justice Breyer's view, other factors, such as the volume of sales in the forum State, id. at 2792, the size and scope of sales by the defendant towards the national market, id., and the nature of the conduct directed at the national market, id., may be enough to infer intention to serve and therefore submit to the laws of the forum State. However, none of those factors were presented in Nicastro. Id. at 2794. At best, Justice Breyer found, Nicastro demonstrated an intent by McIntyre to serve the national market, with a few isolated sales that were actually made in New Jersey by its independent distributor. Id. at 2791. He concluded that those contacts were insufficient to subject McIntyre to the jurisdiction of New Jersey. Id. at 2792. Justice Breyer also emphasized that he was not ready to announce his own version of a stream-of-commerce test, since the facts of Nicastro were insufficient to develop a comprehensive test that takes into account all of the necessary concerns. Id. at 2792-93.

Read as a whole, Nicastro does not clearly or conclusively define the breadth and scope of the stream of commerce theory, as there was not a majority consensus on a singular test. However, whether or not the plurality's strict rule is the de-facto standard for stream-of-commerce cases going

forward, there is no doubt that <u>Nicastro</u> stands for the proposition that targeting the national market is <u>not</u> enough to impute jurisdiction to all the forum States. In that regard, <u>Nicastro</u> overruled the line of cases exemplified by <u>Tobin</u>, <u>Barone</u>, and <u>Power Integrations</u>, which held to the contrary.

In its opposition brief, Plaintiff initially argued that the targeting of a national market was sufficient to invoke the stream-of-commerce theory. Now recognizing that the national market theory is no longer viable, Plaintiff argues in its post-<u>Nicastro</u> supplemental briefing that SDT purposefully directed its activities to serve the New Jersey market. In that regard, Plaintiff points to sales made in New Jersey by Sebotek of hearing aids including SDT's DSPs, as well as sales by other hearing aid manufacturers of hearing aids that include DSPs made by SDT. Based on these sales, Plaintiff argues that SDT foresaw and expected hearing aids containing the allegedly infringing DSPs to be sold and used in New Jersey, and that it intended to benefit from the sales of these hearing aids in New Jersey.[12]

Plaintiff first contends that Sebotek has sold infringing products in New Jersey from 2004 through the present. As noted <u>supra</u>, SDT did not come into being until 2007 and the Court has already declined to impose successor liability on SDT for Gennum's pre-2007 conduct. Hence the Court will consider only sales made by Sebotek in New Jersey of SDT's DSPs from 2007 onward.

Plaintiff, however, fails to cite any record evidence in its supplemental brief of Sebotek's post-2007 sales into New Jersey, thereby failing to meet its burden of establishing jurisdiction on that basis. <u>See</u> <u>Stranahan Gear Co. v. NL Indus. Inc.</u>, 800 F.2d 53, 58 (3d Cir. 1986) (noting that

---

[12] Plaintiff further argues that Gennum's activities comprise a third type of conduct. However, because the Court holds that successor liability does not exist between SDT and Gennum, the Court will not consider contacts by Gennum as relevant to the discussion of stream of commerce-based jurisdiction over SDT.

once the plaintiff has been granted discovery, the plaintiff "cannot rely on the bare pleadings alone

. . .") (quoting Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 63 (3d Cir. 1984));

Heublein, Inc., 936 at 192 (citing Stranahan, 800 F.2d at 58).

Relatedly, SDT argues in its reply and supplemental briefing that Plaintiff concedes that only

5 sales were made by Sebotek into New Jersey, citing Exhibit 4 attached to Plaintiff's opposition

papers. See Pl. Opp., Exh. 4 ("Sebotek Sales"). That exhibit is comprised of Sebotek packing slips

and a summary table totaling the number of Sebotek hearing aids containing Paragon or Voyageur

DSPs sold in New Jersey from 2003 through 2010. The summary table indicates that 5 of the DSPs

were produced by SDT. Sebotek Sales at 1. Two of these sales were of the VQ720 model in 2007,

2 of the VQ510 model in 2010, and 1 of the HD08 model in 2010. Id. There were two additional

sales of the VQ720 model in 2007, but the summary table indicates that those two sales were not of

chips produced by SDT. It would appear that these two 2007 sales were by Gennum because the

dates of these sales (August 16, 2007 and August 30, 2007) predate the formation of SDT on

September 7, 2007.

Sebotek further indicated, in answer to interrogatories from Plaintiff, that four sales of the

VQ720 model were made from 2007 through 2008. See Pl. Opp., Exh. 21 ("Sebotek Supp. Answ.

Interrog."). These sales totaled less than $3,383.00 in revenue. In contrast, Sebotek's total U.S.

sales for the VQ720 model were $1,415,155.06. It is not clear from the record whether Sebotek's

answer to interrogatories references the same four 2007 sales of the VQ720 model found in the

packing list summary table. If they are not the same four, then, at most, Sebotek made a total of

nine sales to New Jersey customers between the years of 2007 through 2010.

Under Nicastro, whether it is five or nine sales by Sebotek of SDT's allegedly infringing

products, that is simply too small of a number from which to conclude that SDT purposefully availed itself of the New Jersey market. Justice Breyer aptly noted in his concurrence that Supreme Court precedent makes clear that a single sale, even accompanied by more extensive sales efforts, is an insufficient basis for asserting jurisdiction. 131 S.Ct. at 2792. Such scant sales activity does not show the "regular . . . flow" or "regular course" of sales in New Jersey that justify the exercise of specific jurisdiction. Id. Likewise, here, the five or nine sales by Sebotek do not suggest that SDT engaged in a "specific effort . . . to sell in New Jersey." Id. Accordingly, SDT, who bears the burden of proving jurisdiction, cannot meet Justice Breyer's less strict stream-of-commerce-test. So too does SDT fail to meet the plurality's more strict test. See id. at 2790 (holding that the sale of one item into New Jersey plus the fact that four items ended upon in New Jersey insufficient to justify exercise of jurisdiction). Accord Northern Ins. Co. of New York v. Construction Navale Bordeaux, No. 11-60462-CV, 2011 WL 2682950, *5 (S.D.Fla. 2011) (holding that 20 sales in Florida over a period of 2.4 years failed to satisfy Nicastro).

Plaintiff further points to a strategic alliance agreement between Sebotek and Gennum that called for a payment of $2.5 million by Gennum to help develop and market Sebotek's products to the United States markets. Pl. Opp. Br., Ex. 7. That agreement is still in effect today between SDT and Sebotek, id., and SDT does not deny any of these allegations. The problem with Plaintiff's reliance on this agreement, however, is that it makes no reference to New Jersey. Thus, it fails to demonstrate any purposeful availment of the New Jersey forum.

Plaintiff alleges that another hearing aid manufacturer, Starkey Industries, made substantial sales of products containing the allegedly infringing DSPs throughout the United States, including New Jersey. Plaintiff submits a letter from Starkey, in response to a subpoena by Plaintiff's attorney,

that detailed the sales of Starkey hearing aids that contained the allegedly infringing DSPs in New Jersey. Pl. Opp. Br., Ex. 10 ("Starkey Ltr."). This letter denotes a total of 927,200 sales of Gennum's and SDT's Paragon, Voyager, and Wolverine models from March 9, 2004 through October 26, 2010. See Starkey Ltr. at 1-2. The letter further specifies that over 4,000 of those were "sold into New Jersey." Id. at 2. Importantly, however, the letter does not specify when these New Jersey sales were made. It is not clear from the letter whether the sales were made prior to SDT's formation in 2007, or after its formation. Thus, this record evidence does not provide sufficient basis for the Court to conclude that SDT purposefully directed any activities toward New Jersey.[13]

The only other evidence Plaintiff cites is a company profile of Starkey found in an online reference database. See id., Ex. 14. That article states that Starkey is the "world's leader in manufacturing custom hearing instruments," id. at 1, yet speaks nothing of post-2007 sales to New Jersey of hearing aids containing SDT's DSPs. Moreover, Plaintiff submits no evidence of any agreement between SDT and Starkey, nor that SDT knew that Starkey sold its products in New

---

[13]    While Starkey's sale of over 4,000 hearing aids in New Jersey is more than a few isolated sales, Plaintiff does not meet its burden of showing that these sales were of hearing aids containing SDT's (as opposed to Gennum's) DSPs. In addition, even assuming that the 4,000 sales could be attributed to SDT, that fact alone would not be dispositive of the jurisdictional analysis. To the extent that sheer volume can be significant enough to infer "intention to submit to the laws of the forum State," Nicastro, 130 S.Ct. at 2787, Plaintiff does not establish how sales of 4,000 hearing aids out of a total of 927,200 sales would put SDT on notice that it could be subjected to the laws of New Jersey. Indeed, the Supreme Court found, on the same day as Nicastro in a companion case, Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S.Ct. 2846 (2011), that the sales of tens of thousands of tires by Goodyear in the forum state through affiliates was an "attenuated connection[ ] to the state" in light of the overall sales of tires in the United States that numbered in the tens of millions. Id. at 2857. Although Goodyear is a general jurisdiction case, its description applies with equal force here. Without more, simply stating that Starkey has sold over 4,000 hearing aids is inadequate to support the exercise of jurisdiction over SDT. The same is true for the sales by Sebotek—$3,383.00 worth of sales is a minimal amount compared to $1,415,155.06 of Sebotek's U.S. sales during a similar time frame.

Jersey. Accordingly, the Court concludes that the New Jersey Starkey sales do not suffice as minimum contacts under <u>Nicastro</u>.

Finally, Plaintiff alleges that SDT purposefully authorized sales of the allegedly infringing DSPs to another hearing aid manufacturer, Zounds, knowing that Zounds was making direct sales in New Jersey. Plaintiff provides an email from SDT's vice president of sales, Mark Wagner, to its CFO, Roy Fritz, describing a meeting he had with Zounds, in which Zounds informed SDT that it may introduce seven new products, all based on SDT's DSPs, to be sold in locations in Arizona, Oregon, Washington, Florida, Montana, Texas, Pennsylvania, Massachusetts, and New Jersey. Pl. Opp. Br., Ex. 18 ("Zounds Email") at 4.

In the email, Mark Wagner is describing an "introductory call" he had with the Zounds team that day, November 17, 2009:

> Couple of take-aways:
>
> - Out of bankruptcy as of September
> - Raising $8M USD, now have $4M in-house . . . The $8M will sustain them for 2 years
> - Cash flow positive by mid 2010
> - Will have 35 store fronts by year's end
> - Will have 10 Doctors offices by year's end
> - Will grow total to 105 Point of Sale locations by mid 2010, and are argeting 200 by end of 2010
> - Locations in AZ, OR, WA, FL, MO, TX, PN, NJ, MA – profile is to locate in strip malls near senior citizen housing complex's
> - Looking to expand into Europe . . .
> - Introducing 7 new products in 2010 (early), all based on SDT
> - Are working on Wolverine designs for future . . .

<u>Id.</u> Attached to the email is the deposition testimony of Roy Fritz, in which he states that Zounds was coming out of bankruptcy at the time of Mark Wagner's meeting with them. Fritz Dep. at

24:13-22.  The purpose of the meeting, according to Fritz, was to determine Zounds' status.  Id.

While this email suggests that Zounds may have intended to reinvigorate itself after bankruptcy, and that it may target New Jersey, it provides no basis for this Court to conclude that Zounds ultimately acted upon that intention.  The email makes clear that Zounds had just made its way out of bankruptcy two months earlier in September, and that Zounds intended to open store front locations and point-of-sale locations.  The only reference to New Jersey is the statement that the "profile is to locate in strip malls near senior citizen housing complex's."  Zounds Email at 4.  There is no indication that Zounds ever took any affirmative steps to open such a location in New Jersey, advertise in New Jersey, or make any sales in the state.

In short, none of the facts cited by Plaintiff are sufficient to establish specific jurisdiction in light of Nicastro.  Neither knowledge or expectation of sales to a particular forum state is enough to establish jurisdiction according to both the plurality opinion and the concurring opinion; in fact, the plurality opinion expressly rejected that premise.  That SDT has a strategic alliance with Sebotek to develop and market hearing aids to the national market is not conduct that targets any specific forum State, as made clear by the plurality in Nicastro.  Furthermore, knowledge that Zounds might have intended to make direct sales in New Jersey is also unavailing, since there is no evidence that any such intention was ever effectuated.

Given that Plaintiff has filed to demonstrate sufficient minimum contacts with New Jersey, the Court need not engage in "notions of fair play and substantial justice" analysis.[14]  Accordingly,

---

[14]     In determining whether exercising jurisdiction comports with fair play and substantial justice, [the Federal Circuit] consider[s] five factors: (1) the burden on the defendant, (2) the forum's interest in adjudicating the dispute, (3) the plaintiff's interest in

for the reasons stated above, the Court finds that Plaintiff has failed its burden of establishing the necessary elements for the exercise of specific jurisdiction over SDT.

## C.     **Calder-Effect Theory**

In Calder, the Supreme Court held that personal jurisdiction, arising out of the intentional conduct by a defendant specifically calculated to cause injury to a plaintiff in a forum state, is proper even if none of the defendant's actions actually took place in the forum state.   465 U.S. at 789 ("[P]etitioners are not charged with mere untargeted negligence.  Rather, their intentional, and allegedly tortious, actions were expressly aimed at [the forum state]").[15]  The Third Circuit has stated that the Calder "effects test" requires the plaintiff to show that: (1) the defendant committed an

---

> obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the states in furthering fundamental substantive policies.

Touchcom, Inc., 574 F.3d at 1417 (citing Burger King, 471 U.S. at 477, 105 S.Ct. 2174).

[15]     In Nicastro, the Supreme Court highlighted the distinct jurisdictional analysis applicable to intentional tort cases.

> As a general rule, the sovereign's exercise of power requires some act by which the defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," though in some cases, *as with an intentional tort*, the defendant might well fall within the State's authority by reason of his attempt to obstruct its laws.

Nicastro, 131 S.Ct. at 2787 (emphasis added) (internal citation omitted).  See also Goodyear, 131 S.Ct. at 2857 n.5 ("[g]eneral jurisdiction to adjudicate has in [United States] practice never been based on the plaintiff's relationship to the forum . . .  When a defendant's act outside the forum causes injury in the forum, by contrast, a plaintiff's residence in the forum may strengthen the case for the exercise of specific jurisdiction.").  Hence, this Court's Calder analysis is not affected by either of those decisions.

intentional tort; (2) the plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; and (3) the defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity. Remick v. Manfredy, 238 F.3d 248, 258 (3d Cir. 2001).

Plaintiff argues that the Federal Circuit applied the Calder test to patent infringement claims in Silent Drive, supra. Silent Drive, however, applied Calder in a declaratory judgment action for non-infringement, where the patentee, the defendant in that case, sent a notice of infringement letter to the plaintiff, which precipitated the suit. Silent Drive, 326 F.3d at 1203-04. The focus, therefore, was not on the activities of the alleged infringer, but on the patentee. Id. In fact, this Court has not found a single case by the Federal Circuit where the Calder test was applied to a patent infringement claim. Nevertheless, Silent Drive cited with approval several cases from other circuits that did adopt the Calder test in the trademark infringement context, which is quite analogous to patent infringement. Id. at 1205-06. Therefore, the Court finds it likely that the Federal Circuit would apply the Calder test in a patent infringement matter, provided that the facts of the case satisfy the requirements of Calder.

Here, Plaintiff claims that personal jurisdiction over SDT is proper under Calder based on the following allegations: (1) SDT knew or should have known that there is a high likelihood that its components infringed Plaintiff's patent; (2) despite that knowledge, SDT intentionally marketed and actively sold its components to its customer (willful infringement) and actively encouraged its customers to use its infringing DPSs in hearing aids, therefore causing its customers to infringe on Plaintiff's patent (inducing infringement); and (3) Plaintiff, the patent holder, resides in New Jersey. Based on these allegations, Plaintiff argues that the "intentional" conduct was directed at New

Jersey, where the "brunt" of the harm was felt. SDT denies these allegations, other than that it has intentionally made sales of its components.

Willful infringement requires "at least a showing of objective recklessness . . . that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent. iLOR, LLC v. Google, Inc., 631 F.3d 1372, 1377 (Fed. Cir. 2011) (internal quotation and citation ommitted). Inducing infringement requires plaintiff to show that "the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringement." Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1322 (Fed. Cir. 2009). In both cases, plaintiff must show that defendant at least had knowledge of the existence of the patent being infringed. See Sentry Protection Prods., Inc. v. Eagle Mfg. Co., 400 F.3d 910, 918 (Fed. Cir. 2005); Spansion, Inc. v. Int'l Trade Comm'n, 629 F.3d 1331, 1355 (Fed. Cir. 2010).

Based on the record before the Court, Plaintiff has established the existence of an intentional tort for purposes of the Calder analysis. While "[i]t is certainly true that patent infringement is an ongoing offense that can continue after litigation has commenced . . . a willfulness claim asserted in the original complaint must necessarily be grounded exclusively in the accused infringer's pre-filing conduct." In re Seagate Tech., LLC, 497 F.3d 1360, 1374 (Fed. Cir. 2007). Here, Plaintiff asserts that SDT had knowledge of the Patent because of the Court's Orders for Letters Rogatory to SDT on both May 27, 2009 and June 17, 2010. Plaintiff did not amend its Complaint to add SDT as a defendant until March 3, 2010. As such, the May 27, 2009 letter would have given SDT knowledge of the Patent. Plaintiff further alleges, and SDT does not dispute, that despite this knowledge, SDT continued to actively sell the alleged infringing DSPs as well as encouraging others to sell hearing aids containing the alleged infringing DSPs before SDT was added as a defendant in

this case. Hence, the Court finds that Plaintiff has sufficiently established the existence of an intentional tort, as required by Calder for the purpose of establishing personal jurisdiction.

The Court also finds that Plaintiff has established the second prong of the Calder test, that the focal point of the harm was felt in New Jersey. Plaintiff has its principle place of business in New Jersey, and Plaintiff alleges that the alleged tortious conduct impacted and harmed its business. "[I]n patent litigation the injury occurs at the place where 'the infringing activity directly impacts on the interests of the patentee,' which includes "the place of the infringing sales[.]" Trintec, 395 F.3d at 1280 (quoting Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1571 (Fed.Cir.1994)) (alteration in original). It is therefore plausible for Plaintiff to contend that it suffered the brunt of the harm in New Jersey. See Argentum Med., LLC v. Noble Biomaterials, No. 08-1305, 2009 WL 1444288, at *5 (M.D. Pa. May 21, 2009). Accordingly, the second prong of the Calder test is satisfied.

However, Plaintiff fails to establish the third prong of the Calder test, that SDT expressly aimed its tortious conduct at New Jersey. In light of a lack of Federal Circuit precedent applying Calder, the Silent Drive court looked to the law of the regional circuits in fashioning its ruling. Some of the regional circuit cases relied upon by the Federal Circuit in Silent Drive can be read to support the proposition that as long as it is reasonably foreseeable that a defendant's infringing products may end up in a forum state, thus causing harm in the forum state, and the defendant knew that the plaintiff is a resident of that forum state, then the "express aiming" prong of Calder would be satisfied. See Dakota Indus., Inc. v. Dakota Sportswear, Inc., 946 F.2d 1384, 1391 (8th Cir. 1991); Bancroft & Masters, Inc. v. Augusta Nat'l Inc., 223 F.3d 1082, 1087 (9th Cir. 2000); Janmark, Inc. v. Reidy, 132 F.3d 1200, 1202 (7th Cir. 1997).

Nonetheless, more recent decisions from these same circuits indicate that mere foreseeability is not enough. In contrast to its decision in Bancroft, the Ninth Circuit expressly held in Pebble Beach Co. v. Caddy, 453 F.3d 1151 (9th Cir. 2006), that "'something more' is needed in addition to a mere foreseeable effect." Id. at 1156. The plaintiff in Pebble Beach was a well-known golf course and resort located in California. Id. at 1153. The defendant was the owner of a bed-and-breakfast in southern England, which was located on a cliff overlooking the pebbly beaches of England's southern shore. Id. It was aptly named "Pebble Beach." Id. The defendant advertised his services on a website, www.pebblebeach-uk.com, which did not include a golf course. Id. The website was non-interactive, and did not allow customers to make reservations or otherwise book rooms or pay for services online. Id. at 1154. The plaintiff brought suit, alleging intentional infringement and dilution of its "Pebble Beach" trademark by the defendant. Id.

The Pebble Beach court found that even assuming that 1) the defendant had knowledge of the plaintiff and that it was located in California; and 2) it was foreseeable that California customers might read the advertisement on the defendant's website and thereby cause harm to the plaintiff's trademark in California, personal jurisdiction was not proper because the plaintiff failed to allege any intentional conduct that was expressly aimed at California. Id. at 1156. In reaching its holding, the court explicitly clarified Bancroft, stating that the defendant in Bancroft did "something more than commit a foreign act with foreseeable effects in the forum state." Id. at 1157.[16]

_____

[16] In this connection, the Ninth Circuit has recently relied upon Pebble Beach to hold that the use of copyrighted photos on a defendant's website to exploit the California market constitutes express aiming under the Calder test. See Mavrix Photo, Inc. v. Brand Technologies, Inc., --- F.3d ----, 2011 WL 3437047, *8 (9th Cir. 2011); id. at *9 (noting that defendant's website was visited by numerous California residents and had a specific focus on the entertainment industry in California).

The Seventh Circuit echoed the same conclusion in clarifying its ruling of Janmark in a later decision, Tamburo v. Dworkin, 601 F.3d 693 (7th Cir. 2010). In Tamburo, the Seventh Circuit acknowledged that Janmark may have taken too broad of a view of Calder, by relying upon the foreseeability of injury in the forum state. Id. at 705. Moreover, the Seventh Circuit clarified that Janmark's "jurisdictional conclusion was premised on the Illinois-based injury and the fact that the defendant acted with the purpose of interfering with sales originating in Illinois. Thus, despite its broad language about Calder, Janmark ultimately considered the relationship between the allegedly tortious conduct and the forum state itself." Id. at 706. Likewise, the Eighth Circuit has also clarified its ruling of Dakota in a very similar fashion. Johnson v. Arden, 614 F.3d 785, 797 (8th Cir. 2010) ("We therefore construe the Calder effects test narrowly, and hold that, absent additional contacts, mere effects in the forum state are insufficient to confer personal jurisdiction.").[17]

In addition, other circuits, including the Third Circuit, have also found that mere foreseeability is not enough. See Marten v. Godwin, 499 F.3d 290, 298 (3d Cir. 2007) ("To establish that the defendant 'expressly aimed' his conduct, the plaintiff has to demonstrate the defendant knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum, and point to specific activity indicating that the defendant expressly aimed its tortious conduct at the forum."); Clemens v. McNamee, 615 F.3d 374, 380 (5th Cir. 2010) ("Clemens points to the harm he suffered in Texas and to McNamee's knowledge of the likelihood of such damage in the forum. Yet . . . Clemens has not made a prima facie showing that McNamee made statements in which

---

[17]     Silent Drive noted another Eighth Circuit case, Hicklin Eng'g Inc. v. Aidco, Inc., 959 F.2d 738 (8th Cir. 1992), as potentially in conflict with Dakota. Silent Drive, 326 F.3d at 1205 n. 5. The Johnson court cited to that exact case to support its clarified holding. Johnson, 614 F.3d at 797.

Texas was the focal point . . . nor were they made in Texas or directed to Texas residents any more than residents of any state."); Young v. New Haven Advocate, 315 F.3d 256, 262 (4th Cir. 2002) ("[A]lthough the place that the plaintiff feels the alleged injury is plainly relevant to the jurisdictional inquiry, it must ultimately be accompanied by the defendant's own sufficient minimum contacts with the state if jurisdiction is to be upheld.") (internal quotation, citation, and alteration omitted); U.S. v. Swiss Am. Bank, Ltd., 274 F.3d 610, 623 (1st Cir. 2001) ("Calder cannot stand for the broad proposition that a foreign act with foreseeable effects in the forum state always gives rise to specific jurisdiction.") (internal quotation and citation omitted).

Given the accord demonstrated by a significant majority of the regional circuits that mere foreseeability of injury is not enough to subject an alleged infringer to jurisdiction, this Court finds that it is highly likely the Federal Circuit would hold the same. Indeed, while Silent Drive relied on the now-outdated regional circuit precedent described supra, Silent Drive does not explicitly or implicitly approve a foreseeability-only test.

Returning to the facts here, Plaintiff has not shown that SDT's alleged intentional conduct was expressly aimed at New Jersey. As discussed above in the stream-of-commerce analysis, Plaintiff points to no contact whatsoever where SDT purposely or expressly directed its conduct specifically toward New Jersey. There were no sale or marketing activities directed toward New Jersey, no showing that New Jersey was the destination for a significant amount of SDT's components, nor is there any evidence that Plaintiff or this forum was the intended target of SDT's allegedly tortious acts. At best, all Plaintiff has established, for jurisdictional purposes, is that SDT intentionally continued to infringe upon the Patent even after it was made aware of the Patent by the May 27, 2009 letter, and encouraged its customers to do the same, by its continued sales and

marketing in the <u>national market</u> of its components.[18]  That alone is insufficient to establish the express-aiming prong of the <u>Calder</u> test.  This result is buttressed by the <u>Calder</u> decision itself, which reasoned that jurisdiction in California was proper where the publisher of a allegedly libelous newspaper article had its "largest circulation" in that state.  465 U.S. at 790.  Here, by contrast, SDT does not sell the majority of its DSPs in New Jersey.  Therefore, the Court rejects Plaintiff's assertion of personal jurisdiction under <u>Calder</u>.[19]

## IV.  Conclusion

For the foregoing reasons, SDT's motion to dismiss is **GRANTED**, and Plaintiff's claims against SDT are **DISMISSED**.  An appropriate order shall follow.


/s/ Freda L. Wolfson
The Honorable Freda L. Wolfson
United States District Judge

Date: August 22, 2011

---

[18]     There is no showing that any of those customers are based in New Jersey.

[19]     Because the Court does not exercise original jurisdiction over any claims against SDT, the Court need not address Plaintiff's argument regarding supplemental jurisdiction.